WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Hospital and Healthcare Association, an Arizona corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>Thomas J. Betlach, Director of the Arizona Healthcare Cost Containment System; Kathleen Sebelius, Secretary of the United States Department of Health and Human Services,<br><br>                    Defendants. | No. CV11-2348-PHX-DGC<br><br>**ORDER** |

Plaintiff Arizona Hospital and Healthcare Association ("Plaintiff") has filed a motion for a preliminary injunction.  Doc. 7.  Defendant Thomas J. Betlach ("the Director") and Defendant Kathleen Sebelius ("the Secretary") have filed separate responses.  Docs. 44, 54.  The motion is fully briefed.  Docs. 7, 44, 54, 55.  The Court heard oral argument on March 1, 2012.  For the reasons that follow, the Court will deny the motion.

I.      **Background.**

The State of Arizona has elected to participate in the federal Medicaid program.  Doc. 1, at 6, ¶ 17.  Arizona has named its program the Arizona Health Care Cost Containment System ("AHCCCS").  *Id.*  The Arizona Health Care Cost Containment System Administration ("AHCCCSA") is the single state agency charged with administering AHCCCS.  *Id.*  In order to receive matching federal financial participation,

state Medicaid plans must comply with applicable federal Medicaid law and regulations. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 430.10, 431.10. State plans must be submitted to the Secretary for approval. 42 C.F.R. §§ 430.10, 447.201(b). The Ninth Circuit has held, under federal Medicaid law, that changes to state plans may not be implemented by the State prior to approval by the Secretary. Doc. 1, at 5, ¶ 13. The Secretary's review and approval of any state Medicaid plan amendment is reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, *et seq.*

AHCCCS payments are disbursed in two ways. The first is a fee-for-service ("FFS") process whereby AHCCCSA determines whether the health care services were covered and furnished by a provider to an eligible beneficiary, and, if so, pays the service providers directly. Doc. 1, at 6-7, ¶ 18. The second is through managed care plans operated by public and private entities under contract. *Id.* Under the managed care model, the State pays a capitation rate to managed care organizations ("MCOs") who then negotiate contractual managed care rates with hospital providers. Most of the AHCCCS program is conducted under a managed care model. Doc. 1, at 8, ¶ 24. Plaintiff alleges, however, that changes to hospital FFS rates have a direct impact on how much hospitals are paid through managed care programs because contracts, federal law, and Arizona law all tie payments under managed care plans to FFS rates. Doc. 1, at 8-9, ¶¶ 24-28.

On April 6, 2011, Senate Bill 1619 ("SB 1619") was signed into law by Governor Brewer. SB 1619 was intended to balance the State's health care budget. Doc. 1, at 10, ¶ 34. The bill made several changes to AHCCCS's reimbursement policy. Section 11 of SB 1619 amends A.R.S. § 36-2903.01, which concerns the powers and duties of AHCCCSA, eliminating language concerning reimbursement to hospitals for "claims with extraordinary operating costs per day" or "outliers." *Id.* Section 31[1] of SB 1619

---

[1] Plaintiff's complaint incorrectly cites Section 32 of SB 1619. Doc. 1, at 10-11, ¶ 34. Section 32 reads, in its entirety: "Notwithstanding any other law, for rates effective October 1, 2011 through September 30, 2012, the Arizona health care cost containment system administration may reduce payments for institutional and noninstitutional services

vests AHCCCSA with authority to "reduce payments for institutional and non-institutional services by up to five per cent" for rates effective October 1, 2011 through September 30, 2012. *Id.* The rates were previously reduced by five percent on April 1, 2011, and have not been increased since approximately 2007. Doc. 1, at 9-10, ¶ 29.

Under the authority of SB 1619, AHCCCS prepared three state plan amendments ("SPAs") to Arizona's Medicaid plan concerning payment reductions for inpatient and outpatient hospital reimbursement. Doc. 1, at 11, ¶ 37. SPA 11-009-A proposed to reduce payment rates for inpatient hospital services provided between October 1, 2011 and September 30, 2012 by five percent. *Id.* SPA 11-009-B proposed the same rate reduction for outpatient hospital services. *Id.* at ¶ 38. SPA 11-011 proposed a change in the methodology for calculating additional reimbursement paid to hospitals for high cost "outlier" cases. Doc. 1, at 12, ¶ 39. In conjunction with the proposed changes to outlier payment methodology in SPA 11-011, AHCCCSA announced on May 27, 2011 that it was amending two Arizona administrative regulations concerning outlier payments. Doc. 7, at 7; Doc. 7-7 (Ex. F).

In June 2011, AHCCCSA released a study by Milliman, Inc. Doc. 7, at 8. The study updated a prior study completed in November 2010, and considered the potential impact of the proposed AHCCCS changes.

On June 23, 2011, AHCCCS submitted SPA 11-009-A and SPA 11-009-B to the Secretary's designated agent, Centers for Medicare and Medicaid Services ("CMS"), for approval. Doc. 1, at 11, ¶ 37. On June 24, 2011, AHCCCS submitted SPA 11-011 to CMS for approval. Doc. 1, at 12, ¶ 39.

On July 15, 2011, while the SPAs were pending with CMS, AHCCCSA published a notice in the Arizona Administrative Register that, effective October 1, 2011, AHCCCS would reduce rates by five percent. Doc. 7-8 (Ex. G).

On August 24, 2011, Plaintiff provided materials to AHCCCSA and CMS showing that the proposed reimbursement reductions would adversely impact Medicaid

up to five per cent." S.B. 1619, 50th Leg., 1st Sess. (Ariz. 2011).

beneficiary access to hospital services and the quality of care and efficiency.  Doc. 1, at 15-16, ¶ 47; Doc. 7, at 8.  The information purported to show, among other things, that: (1) the reduced payment rates would not come close to the costs that hospitals incur in treating AHCCCS  members; (2) the reduced rates would adversely impact AHCCCS member access to hospital care, particularly in rural areas; and (3) the Milliman study contained methodological and analytical flaws.  Doc. 7, at 8.  On October 3, 2011, Plaintiff provided CMS with two additional reports by a health care reimbursement and statistics expert.  Doc. 16-3 (Ex. B, CMSLTRS 166-189).

On September 21, 2011, CMS sent AHCCCSA a request for additional information ("RAI") that expressed concerns that SPA 11-009-A would negatively impact access to care.  Doc. 16-10, at 40-44 (AZ PR 288-292); Doc. 7, at 9.  AHCCCSA responded on September 29, 2011.  Doc. 16-10, at 50-57 (AZ PR 298-305); Doc. 7, at 9.  On October 11, 2011, Plaintiff submitted information to CMS addressing inadequacies in AHCCCSA's response to the RAI.  Doc. 16-4 (AZ PR 191-272).  CMS sent AHCCCSA an additional request for information on October 14, 2011.

By separate letters dated November 18, 2011, CMS approved SPA 11-009-A and SPA 11-011, retrospective to October 1, 2011.  Doc. 7, at 9.  On November 21, 2011, CMS approved SPA 11-009-B, retrospective to October 1, 2011.[2]

Plaintiff alleges five claims in its complaint.  Doc. 1.  The first three claims are against the Director: (1) that the rate reductions were not adopted through a public process, in violation of 42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)") and the Supremacy Clause, and that AHCCCSA acted under color of state law to deprive hospitals of their privately enforceable rights in violation of 42 U.S.C. § 1983; (2) that the rate reductions were enacted solely for budgetary reasons, in violation of 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)") and the Supremacy Clause; and (3) that public notice of the rate reductions was not properly given, in violation of 42 C.F.R. § 447.205

---

[2] Plaintiff's complaint incorrectly alleged that CMS approved all three SPAs on November 18, 2011.  Doc. 1, at 16, ¶ 48.

and the Supremacy Clause.  The fourth claim is against the Secretary, and alleges that her approval of the SPAs was arbitrary, capricious, an abuse of discretion, and otherwise inconsistent with governing law, in violation of the APA.   The fifth claim seeks declaratory relief pursuant to 28 U.S.C. § 2201 and A.R.S. §§ 12-1831, *et seq.*, against both Defendants.

On December 20, 2011, the Director filed a motion to dismiss Plaintiff's first three claims.  Doc. 28.  The Court has today, by separate order, dismissed the claim under 42 U.S.C. § 1983 for violation of Section 13(A) as well as the claim for violation of 42 C.F.R. § 447.405(c).  For purposes of the preliminary injunction motion, the Court need only address Plaintiff's remaining claims.

At oral argument on the motion for a preliminary injunction, Plaintiff stated that it is no longer asserting a Supremacy Clause argument with respect to Section 30(A) and that it seeks a preliminary injunction based only on (1) an APA challenge to the Secretary's decision with respect to Section 30(A), (2) a Supremacy Clause claim with respect to Section 13(A), and (3) a Section 1983 claim with respect to Section 13(A).

## II.   Legal Standard for Preliminary Injunction.

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted); *see also Munaf v. Geren*, 553 U.S. 674, 689 (2008).  To obtain a preliminary injunction, Plaintiff must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Alternatively, in this circuit, "serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

1127, 1135 (9th Cir. 2011).  A "serious question" is one on which the movant has a fair chance of success on the merits.  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The Court has considered each of the factors required for a preliminary injunction. As explained below, the Court concludes that Plaintiff has shown the existence of serious questions, but not a likelihood of success on the merits, and has failed to show that it will suffer irreparable harm, that the balance of hardships tips sharply in its favor, and that public policy favors issuance of a preliminary injunction.  Because Plaintiff must establish all four prongs to obtain a preliminary injunction, *Alliance for the Wild Rockies*, 632 F.3d at 1135, its request for a preliminary injunction must be denied.

**III.    Likelihood of Success on the Merits.**

**A.    Section 30(A) APA Claim.**

Plaintiff argues that it is likely to succeed on the merits of its claim against the Secretary because CMS failed to apply controlling law in evaluating the SPAs and therefore acted arbitrarily and capriciously in violation of the APA.  Doc. 7, at 9-18. Specifically, Plaintiff argues that the CMS failed to consider relevant factors in approving the rate reductions and that its approval was counter to evidence in the record.

**1.    Standard of Review.**

Under the APA, a reviewing court must hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *O'Keefe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The standard is deferential.  The Court may not substitute its judgment for that of the agency.

1    *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

2              **2.    *Chevron* Deference.**

3         The parties initially disagree about the degree of deference owed to the Secretary's

4    interpretation of Section 30(A).  Plaintiff argues that the relevant factors that CMS must

5    consider are, at a minimum, the factors set forth in Section 30(A): efficiency, economy,

6    quality of care, and equal access.  *See* 42 U.S.C. § 1396a(a)(30)(A).  Plaintiff further

7    argues that CMS is bound by the Ninth Circuit's interpretation of Section 30(A) in

8    *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491 (9th Cir. 1997) ("*Orthopaedic II*"),

9    requiring states to establish hospital reimbursement rates that "bear a reasonable

10   relationship to efficient and economical hospitals' costs," and to "rely on responsible cost

11   studies, its own or others', that provide reliable data as a basis for its rate setting."  *Id.*

12   at 1496.  Plaintiff argues that such cost analysis must have been part of the Secretary's

13   decision approving the SPAs.

14        The Secretary responds that she has "consistently taken the position" that

15   Section 30(A) does not require states to base payment rates on costs incurred by

16   providers (Doc. 44, at 15), that this interpretation of Section 30(A) is entitled to *Chevron*

17   deference, and that she therefore was not required to consider the cost analysis required

18   by *Orthopaedic II* when she approved the SPAs.  Because it is true that federal agencies

19   need not follow circuit law when their analysis is entitled to *Chevron* deference and when

20   the circuit law is not based on the unambiguous language of the relevant statute, *Nat'l*

21   *Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005), the

22   Court must determine whether it is likely to apply *Chevron* deference to the Secretary's

23   interpretation of Section 30(A).[3]

24        The Secretary argues that she has consistently interpreted Section 30(A) as not

25   requiring the consideration of provider costs, and that this interpretation can be seen in

26   _____

27        [3] The Court need not address the *Skidmore* deference issue that Plaintiff raises in
     its reply brief (Doc. 55, at 5) because the Secretary has not argued that her interpretation
28   of Section 30(A) is entitled to *Skidmore* deference, or that such deference would trump
     Ninth Circuit case law.

briefs filed with the Supreme Court and a proposed rule promulgated by the Secretary. *See* Doc. 44, at 15-16, n.12.  The Secretary does not point to a formally promulgated rule or generally applicable policy statement as evidence of her interpretation.

In response, Plaintiff cites cases suggesting that there is no basis for *Chevron* deference to informal policies illustrated only in legal briefs or proposed rules.  Doc. 55, at 2.  These cases, however, do not reach a *Chevron* analysis.  *See Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 654 (9th Cir. 2009) (suit by Medi-Cal providers and recipients seeking to enjoin the state Medicaid director from implementing rate reductions, in which the Ninth Circuit clarified that *Orthopaedic II* remained valid after *Sanchez*, and cited *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000) for the proposition that deference to an agency opinion expressed in the course of litigation is limited to an agency's interpretation of its own regulations); *Tedori v. United States*, 211 F.3d 488, 492 (9th Cir. 2000) (suit by taxpayers challenging the denial of an interest deduction, in which the Ninth Circuit concluded that proposed regulations carry no more weight than a position advanced in a brief).

The Secretary argues that even an implicit agency policy is entitled to *Chevron* deference if Congress has clearly delegated authority to the agency to interpret the relevant statute – that the more express the delegation of authority, the less formal the agency's policy must be.  The Secretary asserts that Congress has expressly delegated to her the broad discretion to determine whether state Medicaid plans comply with the requirements of federal law.  Doc. 44, at 3.  Plaintiff does not appear to contest this assertion.

This case is similar to *Pharmaceutical Research and Manufacturers of America v. Thompson*, 259 F. Supp. 2d 39 (D.D.C. 2003), in which appellants challenged the Secretary's statutory interpretation of another Medicaid statute because it was at best "an informal decision not made in accordance with the rigors of the APA and thus undeserving of *Chevron* deference" and because it was "formulated in the shadow of impending litigation[.]"  *Id.* at 69.  The district court acknowledged that the informal

nature of the letter from CMS to the state Medicaid directors was a marked contrast to the classic *Chevron* scenario of notice-and-comment rulemaking, but relied on the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001), which clarified that "the absence of 'administrative formality' is not dispositive on the question of *Chevron* deference." 259 F.Supp.2d at 69 (quoting *Mead*, 533 U.S. at 231). The letter at issue in *Pharmaceutical Research* explicitly stated the Secretary's position that prior authorization programs require the Secretary's approval, and thus differs from the SPA approval letters in this case. The district court also noted, however, that "[e]ven if the [letter] itself did not 'carry the force of law,' *Mead*, 533 U.S. at 221, the particular applications of the interpretation contained therein – such as the Secretary's approval of [the proposed amendment] – perhaps do." *Id.* "Most importantly, the Secretary's position is eminently reasonable." *Pharm. Research*, 259 F. Supp. 2d at 72.

The D.C. Circuit affirmed the district court's decision and rejected appellants' contentions – the same arguments made by Plaintiff here – that the Secretary's decisions did not qualify for *Chevron* deference because they were not the result of a formal administrative process, did not involve agency expertise, were inconsistent with previous interpretations, and were developed solely in response to a lawsuit. *Pharm. Research & Mfrs. v. Thompson*, 362 F.3d 817, 821 (D.C. Cir. 2004). The Court of Appeals found that "[t]his argument overlooks the nature of the Secretary's authority. This is not a case of implicit delegation of authority through the grant of general implementation authority. In the case of the Medicaid payment statute, the Congress expressly conferred on the Secretary authority to review and approve state Medicaid plans as a condition to disbursing federal Medicaid payments." *Id.* at 821-22. *See* 42 U.S.C. § 1396 ("The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance."). The D.C. Circuit concluded that through this "express delegation of specific interpretive authority," *Mead*, 533 U.S. at 229, Congress intended that the Secretary's determinations, based on interpretation of relevant statutory provisions, should have the force of law.

*Pharm. Research*, 362 F.3d at 822.  It accordingly afforded the determinations *Chevron* deference.  *Id.*

Other circuits have noted that an agency "rule would be preferable" if *Chevron* deference is to apply, but they have held that a formal rule is not required.  *Gould v. Shalala*, 30 F.3d 714, 720 n.7 (6th Cir. 1994); *see also Harris v. Olszewski*, 442 F.3d 456, 470 (6th Cir. 2006) ("[T]he Supreme Court has already 'rejected [the] argument' that when an 'interpretation was not made after a formal adjudication or notice-and-comment rulemaking, . . . it does not warrant *Chevron*-style deference.'") (quoting *Cleveland Nat'l Air Show, Inc. v. United States DOT*, 430 F.3d 757, 763-64 (6th Cir. 2005)); *Georgia v. Shalala*, 8 F.3d 1565, 1571 n.8 (11th Cir. 1993) ("A rule would be preferable, but we are not convinced that the agency is required to promulgate rules pursuant to every subsection of the widely-acknowledged complex Medicaid statute."); *Emerson v. Steffen*, 959 F.2d 119, 122 (8th Cir. 1992) (holding that *Chevron* does not require "that the agency's position be stated in a regulation to be entitled to deference").

Additional considerations weigh in favor of reviewing the Secretary's decision under a *Chevron* standard.  Courts may consider "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).  Medicaid is without doubt a "complex and highly technical regulatory program" that the Secretary has "significant expertise" in administering. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).  The Supreme Court has rejected the argument that an agency interpretation advanced against the background of litigation must be disregarded.  *See Barnhart*, 535 U.S. at 221 (listing cases).

For these reasons, the Court concludes that the Secretary's interpretation of Section 30(A), even though not explicitly set forth in a formal rule or decision, likely will be entitled to *Chevron* deference if it otherwise satisfies the requirements of *Chevron*.

The Court will address those other steps briefly.

The first step is to determine whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the answer is yes," then the Court "'must give effect to the unambiguously expressed intent of Congress' and the agency's interpretation receives no deference." *Phoenix Mem'l Hosp. v. Sibelius*, 622 F.3d 1219, 1225 (9th Cir. 2010) (quoting *Chevron*, 467 U.S. at 842). No party has argued this position, and Section 30(A) is silent on provider costs.

If the statute is silent or ambiguous, the second step under *Chevron* is to determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Section 30(A) requires that state programs "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]" 42 U.S.C. § 1396a(a)(30)(A). The Secretary's determination that this statute requires consideration of efficiency, economy, quality of care, and equal access clearly constitutes a permissible interpretation – it looks directly to the four factors identified by Congress. The Court therefore is likely to conclude that the Secretary's position that Section 30(A) does not require consideration of provider costs is reasonable and reflects a permissible construction of the statute under *Chevron*.

Once it is determined that the Secretary's interpretation of Section 30(A) is entitled to deference, the Court must determine whether the interpretation takes precedence over the Ninth Circuit's rule in *Orthopaedic II*. The Supreme Court has explained that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomm. Ass'n*, 545 U.S. at 982.

*Orthopaedic II* does not claim that its construction of Section 30(A) follows from an unambiguous statute that leaves no room for agency discretion.  The Ninth Circuit's requirement of cost analysis therefore does not trump the Secretary's interpretation of Section 30(A).

In conducting its APA review of the Secretary's approval of the SPAs, the Court therefore is likely to consider whether there is sufficient evidence in the administrative record that the Secretary considered access, quality of care, efficiency, and economy, *see* 42 U.S.C. § 1396a(a)(30)(A), and to conclude that the Secretary was not bound to apply the cost analysis required by *Orthopaedic II*.

### 3.  Section 30(A) Factors.

#### a.  Access.

The Secretary claims that CMS relied on the following methods and procedures to ensure that equal access to services would be maintained under the SPAs: (1) Arizona's consultation with tribal stakeholders for affected members of the FFS population, (2) provider hospitals' historical participation rates in AHCCCS, (3) Arizona's commitment to provide additional metrics safeguarding FFS enrollment, utilization, and expenditures, and (4) Arizona's robust monitoring tools for its overall Medicaid program. Doc. 44, at 21-22.

American Indians constitute a large majority of the AHCCCS FFS membership. The State accordingly engaged in a consultation process with tribal stakeholders, including Indian Health Service ("IHS") and "Tribal 638" facilities.[4]  Doc. 16-8, at 42-43 (AZ PR 41-42) (meeting agendas including discussion of inpatient and outpatient payment methodology under the proposed SPAs and references to SPA drafts).   In response to a question from CMS about its monitoring plan, AHCCCS explained that in regular meetings with IHS and Tribal 638 providers, "AHCCCS has not been made aware of any documented instances that a FFS member did not have access to care at any of

---

[4] IHS and Tribal 638 facilities are the primary providers of hospital services to American Indians, and are exempt from the rate reductions.  Doc. 44, at 12.

these facilities or was not able to be referred to another provider as a result of the rate reductions." Doc. 16-12, at 48-49 (AZ PR 422-23). The Secretary argues that given the exhaustiveness of the State's engagement with stakeholders, including tribal leaders and health care service providers, and the lack of any past or foreseeable access concerns for FFS American Indians, it was reasonable and appropriate for CMS to rely on the consultation process as a "method and procedure" ensuring that the rate reductions would not impede access. Doc. 44, at 23.

The State also provided CMS with information regarding hospitals' historical participation in Medicaid since a 2007 rate freeze and an April 2011 rate reduction. Doc. 44, at 23. An "Access to Care Monitoring Summary" that the State provided CMS shows that from October 2010 to September 2011, managed care contractors have reported 37 provider terminations due to rate issues, none of which were hospitals. Doc. 16-8, at 119 (AZ PR 118). Compared to the total number of providers in each plan's network, ranging from the thousands to tens of thousands, the State concluded that the number of terminating providers is insignificant. *Id.*; Doc. 44, at 23 n.20 ("As of June 30, 2011, this figure would have represented less than one-tenth of one percent . . . of all registered providers participating in Arizona's Medicaid program."). The State later clarified for CMS that the 37 providers "continue to be AHCCCS registered providers and available to the FFS population." Doc. 16-12, at 38 (AZ PR 412).

The State also reported that, as of a previous rate reduction in April 2011, the "majority of [MCOs] have actually increased the overall size of their networks since the first quarter of the current contract year ending September 30, 2011." Doc. 16-8, at 120 (AZ PR 119). The Secretary views this increase in MCO network size as a benefit to FFS members "because MCO-contracted hospital providers are also required to provide services on a fee-for-service basis to FFS beneficiaries." Doc. 44, at 23; *see also* Doc. 16-10, at 60 (AZ PR 308). The Secretary explains that, since actual future participation data is by definition unavailable to an agency before an SPA takes effect, it was not arbitrary or capricious for CMS to conclude from historical data that hospitals

would maintain participation rates during the twelve-months when the October 2011 rate reductions would be in effect.  Doc. 44, at 24.

CMS relied on the State's commitment to monitoring beneficiary access to care. Doc. 44, at 24.   CMS looked initially to the State's monitoring of managed care networks.  The Secretary suggests that a change in access levels to FFS services can be detected through the State's monitoring of managed care networks because "AHCCCS-registered hospitals that provide FFS services are also contracted in managed care networks."  Doc. 44, at 25 (citing Doc. 16-12, at 37 (AZ PR 411)).

CMS did not, however, rely solely on the State's assurances of access in the MCO sector alone, because the rate reductions at issue apply only to FFS services.   CMS accordingly required the State to "establish and submit . . . a process or plan by which [it] will continue to monitor relevant [FFS] metrics, at least on a quarterly basis, to ensure that there is no adverse impact on access as the rate reductions proposed by the SPAs take effect."   Doc. 16-12, at 38 (AZ PR 412).   CMS also required the State to explain how these metrics would be used "to identify access problems and what specific actions [it] would take to address such problems as soon as they are identified."   *Id.*   Arizona responded with a "Quarterly FFS Monitoring Plan" specifically tailored to FFS services, including required quarterly reports on FFS member enrollment, utilization data, and expenditures.  *See* Doc. 16-12, at 48-49 (AZ PR 422-23).   The State also recounted past and current efforts to remedy access issues, including its willingness to transport FFS members in isolated rural areas to other providers as necessary.   *Id.* at 49 (AZ PR 423). The Secretary argues that it was well within CMS's discretion to rely on the State's FFS monitoring plan and any spillover benefits of managed care monitoring as bases to approve the SPAs under Section 30(A).  Doc. 44, at 26.

From this and other evidence in the record not recounted in detail here, the Court concludes that it is likely to find that the Secretary considered the effects of the SPAs on access to care.

### b.   Quality of Care.

The Secretary argues that, although CMS focused more intently on equal access than on quality of care, efficiency, or economy, Plaintiff's allegation that CMS entirely ignored these factors is false.  Doc. 44, at 27.  As to quality of care, CMS asked the State what corrective actions would be taken if its monitoring of provider networks indicates a problem with provider adequacy.  Doc. 16-10, at 56 (AZ PR 304).  The State responded by discussing its willingness to transport FFS members who live in geographically isolated areas with limited service capacity to another provider who can deliver the services, thus demonstrating a connection between provider adequacy and access to care. *Id.*  In response to CMS inquiries, the State also emphasized its mission of providing "comprehensive, quality health care for all of its members."  Doc. 16-10, at 54 (AZ PR 302).  The Secretary points to the State's Quarterly FFS Monitoring Plan, established at CMS's direction, which provides for reporting and tracking of FFS Medicaid beneficiaries' grievances, as a measure that helps to ensure quality care.  Doc. 44, at 27.  FFS patients may also reap benefits from monitoring tools and quality reviews that promote quality of care in MCO networks.  *Id.*; *see* Doc. 16-8, at 121 (AZ PR 120) (requiring managed care contractors to inform AHCCS within one day of an unexpected material change to its network and to include in this notice the contractor's "plans for maintaining the quality of member care").  The Secretary argues that this is ample evidence that the State met CMS's requirement that FFS services be of sufficient quality to satisfy Section 30(A).

Although the evidence that CMS considered quality is not as extensive as the evidence that it considered access, there is evidence in the record that CMS addressed quality with the State.  The Court therefore cannot conclude that Plaintiff is likely to succeed in showing that the Secretary "entirely failed to consider" quality or reached a Section 30(A) decision that "runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

1    **c.    Efficiency and Economy.**

2    With respect to efficiency and economy, CMS asked the State for responses to the

3    agency's Standard Funding Questions in its original SPA submissions.  Doc. 16-8, at 15-

4    17 (AZ PR 14-16).  These questions "sought to elicit information regarding whether

5    Arizona is implementing the state plan in a generally efficient and economical manner."

6    Doc. 44, at 28.    Specifically, CMS inquired about the State's methodology for

7    establishing upper payment limits, what portion of federal matching funds are distributed

8    to providers, funding sources for the State's Medicaid expenditures, expenditure levels

9    for supplemental payments to providers, and whether governmental providers are paid in

10   excess of their costs.  Doc. 16-8, at 15-17 (AZ PR 14-16).  The State's responses to the

11   Standard Funding Questions "provided useful fiscal context for CMS's evaluation of the

12   effect of the proposed rate reductions."  Doc. 44, at 28.

13   The State also provided CMS with a copy of the Milliman Report.  *See* Doc. 16-8,

14   at 12 (AZ PR 11) ("AHCCCS also contracted with Milliman to update a review of the

15   potential impact associated with a 5% rate reduction for both inpatient and outpatient

16   services (attached).").   The Milliman Report analyzed factors such as hospital cost

17   efficiency, AHCCCS payment-to-cost ratios, and Arizona hospital occupancy rates.

18   Doc. 16-1, at 84-88 (CMS LTRS 84-99).   The study found that Arizona hospital

19   operating costs are approximately 12% higher than the nationwide average, and projected

20   that AHCCCS payments would cover approximately 70-72% of costs for Arizona

21   hospitals in 2012.  *Id.* at 86-87.  The study also explained that it "does not attempt to

22   independently analyze quality of hospital care among states," but notes that by defining

23   efficient cost levels as statewide averages rather than isolating the lowest cost hospitals,

24   "it is likely that high quality patient care is achieved at the efficient state cost levels."  *Id.*

25   at 89.

26   The Secretary logically notes that problems with efficiency and economy

27   generally arise when States increase payments to providers, not when they decrease

28   payments.  *Id.* (citing *Penn. Pharmacists Ass'n v. Houstoun*, 283 F.3d at 531, 537-38 (3d

- 16 -

1   Cir. 2002) ("What sort of payments would make a program inefficient and
2   uneconomical?  Payments that are *too high*.  Accordingly, the directive to achieve
3   'efficiency' and 'economy' was obviously not intended to benefit providers.")).  The
4   Secretary argues that it is consistent with efficiency and economy to permit a state to
5   implement reasonable measures that it deems appropriate to ensure the long-term
6   integrity – fiscal and otherwise – of its Medicaid program.  Doc. 44, at 29.  She also
7   suggests that the rate reductions may induce Arizona hospitals to undertake cost-savings
8   measures to bring them closer in line with nationwide cost levels or hospital providers in
9   more cost efficient states, as found by the Milliman Report, and that it was not
10  unreasonable for CMS to conclude that the rate reductions would be consistent with
11  efficient and economical delivery of health care services in view of this possibility.  *Id.*

12      The evidence cited by the Secretary to show her consideration of economy and
13  efficiency is thinner than her evidence to show consideration of quality, and substantially
14  less than her evidence on access considerations.  The Court concludes that Plaintiff has
15  raised serious questions about whether the Secretary's consideration of economy and
16  efficiency was sufficient to survive APA review.  Given the evidence that is in the record
17  on these subjects, however, the Court cannot conclude that Plaintiff is likely to succeed
18  on the merits of showing that the Secretary "entirely failed" to consider these factors or
19  reached a Section 30(A) decision contrary to the evidence in the record.  *Motor Vehicle*
20  *Mfrs. Ass'n*, 463 U.S. at 43.

21      **B.    Section 13(A).**

22      Plaintiff argues that the rate reductions are invalid and conflict with Section 13(A)
23  because the Director failed to comply with the public notice and comment requirements
24  of Section 13(A) and 42 C.F.R. § 447.205.  Doc. 7, at 23.  In a companion order filed
25  today, the Court has dismissed Plaintiff's claim under 42 U.S.C. § 1983 for violation of
26  Section 13(A) and Plaintiff's claim for violation of § 447.205.[5]

27  _____

28      [5] Even if Plaintiff did have a cause of action under § 1983 for a Section 13(A)
    violation, the Court would conclude that Plaintiff is not likely to succeed on the merits of

Plaintiff also alleges a Section 13(A) violation under the Supremacy Clause.  The Court will assume, for purposes of this motion, that a Supremacy Clause claim remains viable after the Supreme Court's recent decision in *Douglas v. Independent Living Center of Southern California*, 132 S.Ct. 1204 (2012).  Although *Douglas* provides ample reason to doubt the viability of such a claim, the current state of Ninth Circuit law seems to support such claims under the Supremacy Clause.  *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009) ("[P]rivate parties could enforce the structural relationship between the federal and state governments so long as they had Article III standing as, essentially, private enforcers of the Supremacy Clause"); *see also Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.").

Section 13(A) requires States to provide "for a public process for determination of rates of payment under the plan for hospital services," which requires (i) publication of proposed rates, methodologies underlying the establishment of the rates, and justifications for the proposed rates, (ii) that providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment, (iii) publication of final rates, methodologies, and justifications, and (iv) that rates take into account the situation of hospitals which serve a disproportionate number of low-income patients with special needs.   42 U.S.C. § 1396a(a)(13)(A).

The Court is likely to conclude that the publication of proposed rates, the methodology underlying the rates, and the justification for the rates was satisfied by the May 24, 2011 posting to the Director's website.  *See* Doc. 7-6, at 3.  That posting advised

that claim.  Section 1983 requires a plaintiff to "demonstrate that the defendant's conduct was the actionable cause of the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008).  As discussed below, the only deficiency Plaintiff has identified under Section 13(A) is a failure to include in the formal notice some of the technical details required by the implementing regulation.  Plaintiff cannot claim that this omission caused it any harm.  Plaintiff had full notice of the proposed rate changes from the Director's website and was actively involved in contesting them.

the public that "[e]ffective October 1, 2011, AHCCCS will reduce all provider reimbursements by 5%," and identified exceptions to the reduction. *Id.* The website stated that additional details regarding the rate reductions could be obtained by clicking on various links, including links to the SPAs, access to care studies, and other related information. Plaintiff's counsel stated at oral argument that he is unable to confirm that these links lacked the information on methodology and justification required by Section 13(A)(i). Plaintiff has thus failed to show that it is likely to succeed in proving that the May 24, 2011 website posting was inadequate under Section 13(A).

Section 13(A) next requires that providers be given "a reasonable opportunity" for review and comment on the proposed rates. The May 24, 2011 website was posted one month before the Director submitted the SPAs to CMS in June 2011 and more than four months before the rates became effective in October 2011. The Court is likely to conclude that this constitutes a reasonable opportunity for review and comment.[6]

### C.   Likelihood of Success Conclusions.

Plaintiff has not shown that it is likely to succeed in showing that the Secretary entirely failed to consider the relevant factors under Section 30(A), although Plaintiff has raised serious questions as to whether the Secretary adequately considered economy and efficiency. Plaintiff has also failed to show a likelihood of succees on its Section 13(A) claims and has raised no serious questions with respect to that claim. Because Plaintiff

---

[6] Plaintiff's counsel argued for the first time at the March 1, 2012 hearing that the formal notice did not satisfy the technical content requirements of 42 C.F.R. § 447.405(c). This argument is inapposite in light of the Court's dismissal of the claim under § 447.405(c). Moreover, even if Plaintiff could assert this alleged violation as part of its claim under Section 13(A), the Court would not be likely to find that it creates a Supremacy Clause problem. Plaintiff's Supremacy Clause claim is based on conflict preemption. Such preemption arises "when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 653 (9th Cir. 2009) (citation omitted). Plaintiff has not shown that the absence of regulation-required content from the formal notice somehow interfered with implementation of the federal Medicaid program. To the contrary, notice of the rate reductions had previously been given by the May 24, 2011 website posting. It is undisputed that Plaintiff was fully aware of these developing rate reductions and was fully engaged in the contesting them from the start.

has succeeded in showing only the existence of serious questions, it may obtain a preliminary injunction only if it also shows that its will suffer irreparable harm, that the balance of hardships tips sharply in its favor, and that public policy favors an injunction.

**IV.    Irreparable Harm.**

Plaintiff claims that its members are being irreparably harmed by the rate reductions because they cannot recover any unlawfully withheld AHCCCS payments from the State in federal court.  Plaintiff asserts that "Arizona hospitals are projecting monetary losses resulting from the Rate Reductions in amounts in the hundreds of thousands, and even millions, of dollars."  Doc. 7, at 26.  The Director objects that "the hospital declarants misleadingly cite revenue losses, the huge majority of which are health plan, not fee-for-service, payments."  Doc. 54, at 10.  Referring to the nine hospitals Plaintiff uses as examples, the Director claims that Plaintiff overstated the hospitals' lost revenue, which "represents less than one-half of one percent (.0043%) of the 2010 gross revenues these nine hospitals reported to the Arizona Department of Health Services."  Doc. 54, at 10 (citing Doc. 54-1, at 24-25 (Betlach Decl. ¶¶ 60-62)).  Plaintiff does not dispute the Director's challenges to the accuracy of its lost revenue figures, but instead replies that "a plaintiff need only demonstrate the threat of some type of irreparable harm, the magnitude of which is immaterial."  Doc. 55, at 13 (citing *Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004)).  Plaintiff claims that "regardless of whether any hospitals have 'overstated' their monetary losses, as long as hospitals will lose some revenue, they are irreparably harmed."  *Id.*

The Ninth Circuit has held that monetary losses may constitute irreparable injury if the plaintiff cannot recover damages from the defendant because a claim would be barred by the Eleventh Amendment.  *Cal.  Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) ("*Cal. Pharm. I*").  The Director and the Secretary do not dispute that Plaintiff will be unable to recover monetary damages due to the State's Eleventh Amendment sovereign immunity.

But an inability to recover monetary losses may not alone be sufficient to establish irreparable harm in this case. In *California Pharmacists Association v. Maxwell-Jolly*, 596 F.3d 1098 (9th Cir. 2010) ("*Cal. Pharm. II*"), the Ninth Circuit explained how claimants in Medicaid cases can establish such harm: "to show a risk of irreparable harm, plaintiffs may show either, as Medicaid beneficiaries, that enforcement of a proposed rule may deny them needed medical care, or, as Medicaid providers, that they will lose *considerable revenue* through the reduction in payments that they will be unable to recover due to the State's Eleventh Amendment sovereign immunity." *Id.* at 1113-14 (citations and quotation marks omitted) (emphasis added). Plaintiff represents Medicaid providers. Thus, to show irreparable harm, Plaintiff must establish not only that it will lose revenues that cannot be recuperated because of the Eleventh Amendment, but also that the lost revenues will be "considerable."

The opinion in *Cal. Pharm. II* provides no explanation for this requirement of "considerable revenue" loss, but it does cite *Cal. Pharm. I* as the source. *Id. Cal. Pharm. I*, although using the word "considerable," does not address the requirement. *See Cal. Pharm I*, 563 F.3d at 850-52. The "considerable revenue" requirement has been repeated in various district court cases in the Ninth Circuit, *see Unity Service*, CV-09-639-S-BLW, 2010 WL 1138947, at *7 (D. Id. March 20, 2010); *California Hospital Association v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1157 (E.D. Cal. 2011); *California Association of Health Facilities v. Maxwell-Jolly*, Nos. CV 10-3259 CAS (MANx), CV 10-3284 CAS (MANx), 2011 WL 6938438, at *7 (C.D. Cal. May 5, 2011), but none of these cases discuss the source or the meaning of the requirement. The requirement may simply be another form of the longstanding maxim that a preliminary injunction will not issue "'to restrain an act the injurious consequences of which are merely trifling.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (quoting *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900)).

In support of its contention that the amount of the loss is irrelevant, Plaintiff cites a Ninth Circuit statement that "the moving party must demonstrate a significant threat of

irreparable injury, irrespective of the magnitude of that injury." *Big Country Foods*, 868 F.2d at 1088.  The opinion cited contains this statement, but does not hold that the plaintiff had established irreparable harm of even a minor amount.  The decision in *Big Country* instead found no harm because the record was "barren of evidence of lost profits." *Id.  Big Country* did cite three other cases in support of the proposition that the magnitude of injury is immaterial, but none of these cases applied the principle.  *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987) (noting that "temporary economic loss alone generally is not a basis for injunctive relief," but that the district court erred in concluding that the only injury to plaintiffs was economic injury when the Circuit had recently held that "allegations of retaliation for the exercise of statutorily protected rights represent possible irreparable harm far beyond economic loss."); *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 137, 1376 (9th Cir. 1985) (plaintiff claimed injury in loss of circulation and revenue, but the court concluded that "this involves purely monetary harm measurable in damages" and that the plaintiff had not otherwise shown a likelihood of injury to reputation); *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (plaintiff alleged the loss of a substantial amount of business, but Ninth Circuit held that "[m]onetary damages are not usually sufficient to establish irreparable harm" and that plaintiff had failed to show other kinds of injury).  None of these cases held that a preliminary injunction may be based on irreparable harm no matter how minimal.

The Court will follow the clear language in *Cal. Pharm. II*. Plaintiff, as a representative of Medicaid providers, must show the likely loss of "considerable revenue" to satisfy the irreparable harm requirement.  *Cal. Pharm. II*, 596 F.3d at 1113-14.  To support its assertion that its members will suffer monetary losses in the "hundreds of thousands, and even millions, of dollars," Plaintiff cites declarations by executives of nine member hospitals.  Doc. 7, at 26.  The projected losses are: $1.2 million per year as a result of the reduction on inpatient rates for Yavapai Regional Medical Center and Yavapai Regional Medical Center East (Doc. 15, at 3 (Barnett Decl. ¶ 6)); $250,000 per

year as a result of the reduction on inpatient and outpatient rates for Southeast Arizona Medical Center (Doc. 14, at 3 (Bickel Decl. ¶ 6)); $110,000 per year as a result of the reduction on inpatient rates for White Mountain Regional Medical Center (Doc. 17, at 3 (Campeau Decl. ¶ 7)); $112,000 per year as a result of the reduction on inpatient rates for La Paz Regional Hospital (Doc. 13, at 3 (Clark Decl. ¶ 6)); $340,000 per year as a result of the reduction on inpatient rates for Little Colorado Medical Center (Doc. 12, at 3 (Hamblen Decl. ¶ 6)); $250,000 per year as a result of the reduction on inpatient and outpatient rates for Benson Hospital (Doc. 11, at 3 (Hurtado Decl. ¶ 6)); $627,000 per year as a result of the reduction on inpatient and outpatient rates for Summit Healthcare (Doc. 10, at 3 (McArthur Decl. ¶ 6)); $6 million per year as a result of the reduction on inpatient and outpatient rates for the four acute care hospitals in the Carondelet Health Network (Doc. 9, at 3 (Mohesky Decl. ¶ 5)); and $340,000 per year as a result of the reduction on inpatient and outpatient rates for Mt. Graham Regional Medical Center (Doc. 8, at 3 (Peters Decl. ¶ 5)).

These loss amounts are summarized in a chart at Doc. 54-2.  In that chart, the Director calculates separate figures for MCO inpatient and outpatient claims compared to FFS inpatient and outpatient claims for fiscal year 2011.  *See* Doc. 54-2, at 2.  These breakout calculations show that MCO claims account for a much larger portion of the hospitals' revenue than FFS claims, and that the rate reductions therefore have a much larger impact on MCO revenue than FFS revenue.  As noted above, this case concerns only FFS payments, a fact admitted by Plaintiff's counsel at the March 1, 2012 hearing.

The Director's calculations estimate that the FFS rate reductions would have a total impact of $774,872 for all nine hospitals, in contrast to the higher figures provided by the hospital declarants.  This loss constitutes less than three one-hundredths of one percent of the nine hospitals' combined 2010 revenues of $3,425,790,922.94.  Doc. 54-2 at 2 (FFS losses represent 0.0226% of 2010 revenues).  The highest FFS loss for any of the nine hospitals will be less than two-tenths of one percent for the Little Colorado Medical Center.  *Id.* (FFS losses represent 0.1440% of 2010 revenues for the Medical

1    Center).  The Court simply cannot conclude that losses amounting to a small fraction of

2    one percent of revenues constitute "considerable revenues" for these hospitals.

3          Even if these losses were found to satisfy the irreparable harm requirement, either

4    because the statement in *Cal. Pharm. II* is later determined to be incorrect or because

5    even a small fraction of revenues can be deemed "considerable" in terms of absolute

6    dollars, Plaintiffs has still failed to show that the balance of hardships favors an

7    injunction or that public policy support the request for injunctive relief.

8    **V.    Balance of Equities and Public Interest.**

9          Plaintiff initially claims that "[t]he only interest that the State or CMS will be able

10   to point to that is potentially implicated by an injunction of the Rate Reductions is

11   Arizona's budget difficulties."  Doc. 7, at 26.  The Director responds that "an injunction

12   would be costly and disruptive to [AHCCCS] and its recipients."  Doc. 54, at 25;

13   Doc. 54-1, at 26 (Betlach Decl. ¶ 65).  The Director estimates that an injunction against

14   the FFS rate reduction from February 1, 2012 through the SPAs' end date of

15   September 30, 2012 would cost AHCCCS an additional $8.63 million.  Doc. 54, at 25;

16   Doc. 54-1, at 32 (Betlach Decl. ¶ 81).

17         The Court agrees with Plaintiff that financial or administrative burdens on

18   AHCCCS that may result from an injunction do not outweigh the interest of ensuring

19   legal compliance.  "A budget crisis does not excuse ongoing violations of federal law,

20   particularly when there are no adequate remedies available other than an injunction."  *See*

21   *Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009).  But in

22   addition to the fact that Plaintiff has not established a likelihood of success in showing

23   that there has been a violation of federal law, the Director claims that an injunction would

24   have an effect beyond creating a financial burden on the State – AHCCCS recipients

25   would also be adversely impacted.  Doc. 54, at 28.  "[I]f AHCCCS were to lose the

26   savings the existing rates represent, [the Director's] only alternatives are to seek approval

27   to eliminate eligibility for current beneficiaries from the remaining optional eligibility

28   portions of the Childless Adult program and/or to further restrict coverage of optional

services."  Doc. 54, at 27; Doc. 54-1, at 27-29 (Betlach Decl. ¶¶ 68-73).

Plaintiff argues that these effects are too uncertain to warrant tipping the balance of equities in Defendants' favor, but the Court finds the Director's assertions to be more than speculative.  The Director explains that AHCCCS must operate within the funds appropriated by the State legislature, and that its costs are driven by scope of benefits, eligibility, and provider reimbursement rates.  Doc. 54-1, at 27 (Betlach Decl. ¶ 66).  The Director states that AHCCCS has already significantly reduced the scope of healthcare coverage to stay within its appropriation.  As of October 1, 2010, AHCCCS eliminated coverage for well exams, dental care, podiatrists' services, and orthodontics, and limited physical therapy services to 15 visits per year.  Doc. 54-1, at 27 (Betlach Decl. ¶ 67).  In addition, AHCCCS found it necessary to implement additional reductions as of October 1, 2011, including limiting the number of covered inpatient hospital days to 25 per year.  *Id.*  The Director also states that AHCCCS has recently restricted eligibility in order to operate within its appropriation.  In October 2011, AHCCCS eliminated coverage for the Medical Expense Deduction group (persons whose income exceeded Medicaid limits but who incurred significant medical expenses), and closed enrollment for persons who did not meet traditional nonfinancial criteria for Medicaid coverage (the Childless Adult group).  Doc. 54-1, at 28 (Betlach Decl. ¶71).  While the Affordable Care Act prohibits states from imposing more restrictive eligibility requirements than those in place under the state plan as of March 23, 2010, AHCCCS has discretion to withdraw or amend coverage to people in the Childless Adults eligibility group because that category was established after March 23, 2010 and is not subject to the limitations of the Affordable Care Act.  Doc. 54-1, at 28-29 (Betlach Decl. ¶¶ 72, 73).

Plaintiff has not disputed these factual assertions, which show that the prospect of reducing AHCCCS benefits is more than theoretical.  It has already occurred in Arizona during the last two years.  The fact that a loss of an additional $8.63 million could require further benefit cuts cannot be dismissed as merely speculative.  *See Harris*, 366 F.3d at 754 (finding that plaintiffs' injuries were not too speculative when they had

demonstrated that the county already had difficulty in providing them access to timely care).

In sum, Plaintiff has not shown that the balance of equities tips in its favor. The Court simply cannot conclude that the prospect of the Plaintiff's members losing less than three one-hundredths of one percent of their revenue outweighs the very real possibility that an injunction would result in the Director having to reduce AHCCCS benefits. The loss of medical care for those who depend on AHCCCS is not outweighed by slight reductions in the revenues of Plaintiff's members. *A fortiori* Plaintiff has not shown that the balance of hardships tips sharply in its favor, as would be required for an injunction to issue on the basis of serious questions on the merits. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

Nor can the Court conclude that public policy favors an injunction. The Ninth Circuit has repeatedly emphasized the importance of ensuring that beneficiaries have access to medical services. *See, e.g.*, *M.R. v. Dreyfus*, 663 F.3d 1100, 1120 (9th Cir. 2011) ("We have several times held that the balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources."); *Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (recognizing "a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country'") (citation omitted).

The Supreme Court has instructed that, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312. The Director has established the possibility that an injunction in this case would have the adverse public consequences of reducing AHCCCS benefits. Public policy favors avoiding that possibility when Plaintiff has not shown that losses to its members from the absence of an injunction would be substantial.

**VI.    Conclusion.**

Plaintiff has raised serious questions regarding the Secretary's compliance with Section 30(A), but has not shown a likelihood of irreparable harm, that the balance of hardships tips in its favor, or that public policy supports an injunction.  As a result, the Court must deny the request for a preliminary injunction.  *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

**IT IS ORDERED** that Plaintiff's request for a preliminary injunction (Doc. 7) is **denied.**

Dated this 23rd day of March, 2012.


_____
David G. Campbell
United States District Judge